# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### December 5, 2000 Session

## STATE OF TENNESSEE v. CEDRIC TERRY

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 98-03179-81    Bernie Weinman, Judge**

---

**No. W1999-01568-CCA-R3-CD  - Filed February 23, 2001**

---

A Shelby County jury convicted defendant of one count of premeditated first degree murder and two counts of attempted first degree murder. Defendant was sentenced to life imprisonment for first degree murder and twenty years for each attempted first degree murder conviction. The two twenty-year sentences run concurrently with each other but consecutively to the defendant's life sentence. In this appeal as of right, defendant challenges: (1) the trial court's denial of his motion to suppress his identification by the two surviving victims, (2) the sufficiency of the evidence, and (3) the length and consecutive nature of his sentences. Upon our review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Michael E. Scholl, Memphis, Tennessee, for the appellant, Cedric Terry.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; John W. Campbell and Rosemary S. Andrews, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Defendant appeals his convictions for first degree murder and two counts of attempted first degree murder for which he received an effective sentence of life plus twenty years. After a careful review of the record, we affirm the judgment of the trial court.

## **FACTS**

On June 6, 1997, at approximately 11:15 p.m., shots were fired outside the F & F Grocery Store in Memphis, Tennessee. Paul Jefferies, apparently an unintended victim, was fatally shot in the back as he ran from the store. The intended victims, fourteen-year-old Shalina Williams and her twelve-year-old step-sister, Latoya Jones, were able to safely flee the scene on foot.

Shalina Williams knew the defendant and the co-defendant, Marcus King, from the neighborhood. She referred to the defendant as "Ced" and sometimes by his nickname, "Peanut." She also knew King by the nickname, "Peanut." Further testimony revealed that the defendant had a "lazy eye," but King did not.

At some point prior to the shooting, Williams and Jones witnessed an altercation involving defendant's sister, and the defendant appeared at the scene of the altercation. Williams testified that defendant's sister was knocked down by another girl. She further testified that the defendant picked his sister up and said, "Well, you know it's not over." Williams and Jones then ran home.

Williams testified that on June 7, 1997, she and Jones exited the F & F Grocery Store and noticed a white LTD being driven by King with the defendant in the passenger seat. She stated that she told Jones, "that's Ced and Peanut," referring to the defendant and co-defendant King. She stated that the defendant rolled down the window and said "there go those two bitches" and opened fire, at which time the girls ran from the store. Williams testified that she fell to the ground, and Jones continued running. Williams then sought shelter behind a car in the parking lot, and Jones fled to the back of the store. Williams testified that the defendant then began firing under the vehicle where she was hiding, although she was not hit. The defendant then left the scene. Thereafter, Williams and Jones fled the scene. Williams testified that when she reached her house, she informed her mother that "Ced" had tried to kill her. Jones' testimony regarding the details of the shooting was essentially the same as Williams' testimony.

Andre Jones testified that he was talking to the victim, Paul Jefferies, when the defendant and King pulled up in a white LTD. He identified the defendant as the person who was shooting.

Officer Clarence Hawkins was the first to arrive at the scene. He testified that Jefferies described a white LTD as the car which transported the shooter. He further testified that Shalina Williams told him "Peanut" was the shooter, and he had a "lazy eye."

The defendant presented testimony from his sister and his girlfriend. First, defendant's sister testified that she was with the defendant on June 6, 1997, at his girlfriend's house from approximately 8:30 p.m. to 10:30 p.m. She stated she left the defendant's girlfriend's house at 10:30 p.m., and the defendant stayed. Defendant's girlfriend testified that on June 6, 1997, the defendant and his sister arrived at her house at approximately 8:30 p.m. She further testified that the defendant's sister left her residence at approximately 10:30 p.m., and the defendant did not leave the house until the "wee hours of the morning."

In addition, the defendant introduced testimony from Marvin Phillips who claimed to have been across the street from the grocery store at the time of the shooting. Phillips stated that the white LTD in question passed right in front of him minutes before the shooting, and he observed five males inside the vehicle. He further testified that he knew both defendants, and neither the defendant nor the co-defendant was in the vehicle.

Defendant and co-defendant King were jointly tried. Defendant was convicted of the premeditated first degree murder of Paul Jefferies and the attempted first degree murder of Shalina Williams and Latoya Jones. Defendant received an effective sentence of life plus twenty-years. The jury was unable to reach a verdict on the charges against King.

## I. SUPPRESSION OF IDENTIFICATION

Defendant alleges the trial court erred in failing to suppress the identification of the defendant by the two surviving victims. Defendant alleges the circumstances surrounding the photographic identification were coercive and overly suggestive. Specifically, defendant contends the identification was made from a photograph on the wall of the local police precinct, and there were no other photographs on the precinct wall.

### A. Testimony

Lieutenant Edward Cash testified at the suppression hearing that Williams and Latoya Jones asked to go down to the local precinct because they knew there was a photograph of the shooter on the wall. He further testified that the photograph was placed on the precinct wall before the shooting with regard to an unrelated aggravated assault. Both girls signed a copy of the picture with a statement indicating the man in the photograph was the shooter. Lieutenant Cash did not testify at trial.

Williams testified at the suppression hearing that she did not know why she and her step-sister were taken to the local police precinct. However, she stated that while the girls were waiting for Lieutenant Cash, she noticed a picture of "Ced" on the wall and pointed it out to her sister. She explained that the photograph of the defendant was the only photograph on the wall and was taped to a sheet of paper containing the name of the defendant along with the word "Wanted." Williams told the officers, "that's 'Ced' right there. He's responsible for the shooting." Williams claimed she had never seen the photograph prior to that time. However, at trial Williams indicated that she told the officers that there was a picture of the defendant on the wall at the precinct, and she subsequently went to the precinct and identified defendant's photo.

Officer Hawkins testified at trial that he interviewed Shalina Williams at the scene after the shooting. He further testified that she said the defendant was the shooter, and she had previously seen his picture on the wall at the precinct. Officer Hawkins did not testify at the suppression hearing.

Latoya Jones did not testify at the suppression hearing but did testify at trial. She testified that Williams already knew that defendant's picture was on the precinct wall, and that they went to the precinct so Williams could point it out to the officers.

The suppression hearing testimony and trial testimony further revealed that both Williams and Jones knew the defendant from the neighborhood; Williams told Jones that it was "Ced" upon seeing him in the vehicle; Williams told her mother and others shortly after the shooting that "Ced" was the perpetrator; and both surviving victims identified the defendant at trial as the perpetrator.

## B. Trial Court Findings

At the conclusion of suppression hearing, the trial court stated that there was no proof that the officers had purposely placed the photograph of the defendant on the precinct wall just for the victims to observe. To the contrary, the trial court found that the proof revealed that the "picture was on the wall for an entirely different purpose." The trial court found that the identification was based upon the witnesses' prior knowledge of the defendant, not upon the photograph. Thus, the trial court concluded there was no "suggestiveness as far as the actual identification is concerned."

## C. Standard of Review

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this Court unless the evidence contained in the record preponderates against them. State v. Carter, 988 S.W.2d 145, 149 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolves any conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, this Court is not bound by the trial court's conclusions of law. State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. Braziel v. State, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975). This court may consider the testimony at both the suppression hearing and at trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

## D. Applicable Law

Convictions based on eyewitness identification at trial following a pre-trial photographic identification will be set aside only if the photographic identification was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247 (1968). However, a pre-trial confrontation procedure may be unlawful if, under the totality of the circumstances, the procedure is unnecessarily suggestive. Moore v. Illinois, 434 U.S. 220, 227, 98 S. Ct. 458, 464, 54 L. Ed. 2d 424 (1977).

Although it may be suggestive, an identification may satisfy due process as reliable and admissible when considering the totality of the circumstances. *See* State v. Brown, 795 S.W.2d 689, 694 (Tenn. Crim. App. 1990). This Court must consider five factors in determining whether the in-court identification is reliable enough to withstand a due process attack despite the suggestiveness of the pre-trial identification. Neil v. Biggers, 409 U.S. 188, 199, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401 (1972); State v. Strickland, 885 S.W.2d 85, 88 (Tenn. Crim. App. 1993). These factors are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the confrontation. Strickland, 885 S.W.2d at 88 (citing Neil, 409 U.S. at 199).

**E. Our Conclusion**

The trial court did not err in failing to suppress the identification of the defendant. We note (1) the victims already knew the defendant prior to the shooting; (2) the victims had ample opportunity to observe the defendant as they were leaving the store; (3) the victims were focused on the defendant because of their fear; (4) Williams told her mother and the officers shortly after the shooting and prior to the photographic identification that "Ced" was the shooter; (5) the description of the defendant was accurate; (6) the victims adamantly stated that the defendant was the shooter; and (7) the photographic identification of the defendant was made less than twenty-four hours after the incident. Furthermore, we reach the same result regardless of whether Williams first saw the photograph before or after the shooting. Thus, we conclude that, even if the photographic procedure was suggestive, the in-court identification of the defendant was sufficiently reliable to withstand a due process attack.

The defendant further argues Williams' identification was tainted since one of the officers made sexually suggestive comments at the police precinct. Williams' testimony at the suppression hearing did not mention anything about sexual comments. However, Williams testified at trial that such comments were made. She testified that even though she felt intimidated by the comments, she did not make a false identification. Regardless, it is clear that the defendant had previously stated to her step-sister, mother and officers at the scene that the defendant was the shooter. Furthermore, she testified at the preliminary hearing and at trial that she recognized the defendant, "Ced," from the neighborhood and was sure he was the shooter. Thus, regardless of whether such comments were or were not made by an officer, her identification of the defendant was not tainted.

## II.  SUFFICIENCY OF THE EVIDENCE

Defendant alleges the evidence is insufficient to sustain his convictions. Specifically, defendant claims the jury heard substantially the same evidence with regard to his involvement as they did with regard to his co-defendant's involvement. Thus, he argues that since the jury was unable to reach a verdict against his co-defendant, they could not have reasonably concluded

defendant was guilty. Additionally, the defendant challenges the credibility of the state's eyewitnesses and asserts he successfully presented an alibi defense.

## A. Standard of Review

In Tennessee, great weight is given to the result reached by the jury in a criminal trial. A jury verdict accredits the state's witnesses and resolves all conflicts in favor of the state. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *Id.*; State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Moreover, a guilty verdict removes the presumption of innocence which the appellant enjoyed at trial and raises a presumption of guilt on appeal. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The appellant has the burden of overcoming this presumption of guilt. *Id.*

Where sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Abrams, 935 S.W.2d 399, 401 (Tenn. 1996).

## B. Inconsistent Verdict

A court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning. Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973). Each participant in a crime should be viewed independently, acknowledging the role of the jury as the final arbiter of the facts. State v. Gennoe, 851 S.W.2d 833, 836 (Tenn. Crim. App. 1992). A defendant's conviction is not fundamentally unfair even if a co-defendant is acquitted. State v. Lewis, 919 S.W.2d 62, 67 (Tenn. Crim. App. 1995). Where there are multiple defendants, a jury's inability to reach a verdict as to one defendant does not effect the reasonableness of the adjudication of guilt with regard to the other defendant(s). Thus, our focus is strictly upon whether the evidence is sufficient as to the defendant; the jury's determination regarding the co-defendant is irrelevant.

## C. Evidentiary Analysis

At trial, Williams testified that she and Jones witnessed an altercation involving the defendant's sister, after which the defendant stated "it's not over." Both girls testified that on June 6, 1997, a white LTD pulled up in front of the store; defendant rolled down the window and yelled "there go those two bitches;" and then defendant opened fire. Both victims and another bystander specifically identified the defendant as the shooter. The jury also heard testimony that Williams and Jones made identifications of the defendant shortly after the shooting. Questions involving the credibility of eyewitness testimony identifying the defendant as the perpetrator are for the jury's determination, not this court. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

While the defendant did present alibi testimony, it was the jury's prerogative to reject this testimony. *See* State v. Underwood, 669 S.W.2d 700, 703 (Tenn. Crim. App. 1984).

Therefore, the eyewitness testimony was sufficient to support the convictions for the first degree murder of Paul Jefferies and the attempted first degree murder of Shalina Williams and Latoya Jones.

### D. Transferred Intent - First Degree Murder

Apparently, it was the state's theory that the defendant intended to kill Williams and Jones but, instead, killed bystander Paul Jefferies. Although not raised by the defendant, we will address whether premeditation was established for the murder of Paul Jefferies.

This case is controlled by Millen v. State, 988 S.W.2d 164 (Tenn. 1999). In Millen the defendant was indicted for both premeditated murder and felony murder. The jury was charged under the doctrine of "transferred intent," and the jury convicted the defendant of premeditated first degree murder. The court concluded that it was unnecessary to resort to the doctrine of "transferred intent" under the first degree murder statute, and the most appropriate charge involving an "unintended victim" is felony murder. *Id*. at 167-68. However, the court also concluded that if the evidence indicates that the defendant, with premeditation, intended to kill a particular person, then the killing of another, even if not the intended victim, is premeditated first degree murder. *Id*. at 168. The court affirmed the premeditated first degree murder conviction. *Id*.

Millen requires the same result in the case at bar. After viewing the evidence in a light most favorable to the prosecution, there was more than sufficient evidence for the jury to have found that the defendant intentionally and with premeditation attempted to kill Shalina Williams and Latoya Jones, but instead killed Paul Jefferies. Thus, the evidence is sufficient to support the conviction of premeditated first degree murder of Paul Jefferies. Tenn R. App. P. 13(e).

### III. SENTENCING

Defendant challenges his twenty-year sentences for the attempted first degree murder of Shalina Williams and Latoya Jones which run consecutively to his life sentence. Specifically, defendant alleges the trial court inappropriately applied enhancement factors, failed to apply mitigating factors, and erroneously sentenced him to partial consecutive sentences.

### A. Standard of Review

This Court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If the trial

court fails to comply with the statutory directives, there is no presumption of correctness and our review is *de novo*. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

The presumptive sentence for attempted first degree murder, a Class A felony, is the midpoint of the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). Therefore, the presumptive sentence for a Class A standard offender is twenty years. *See* Tenn. Code Ann. § 40-35-112(a)(1). However, if such factors do exist, a trial court should enhance the sentence within the range for enhancement factors and then reduce the sentence within the range for the mitigating factors. Tenn. Code Ann. § 40-35-210(e). No particular weight for each factor is prescribed by the statute, as the weight given to each factor is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record. State v. Moss, 727 S.W.2d 229, 238 (Tenn. 1986); State v. Leggs, 955 S.W.2d 845, 848 (Tenn. Crim. App. 1997); *see* Tenn. Code Ann. § 40-35-210 Sentencing Commission Comments.

## B.  Length of Sentence

The defendant had two prior misdemeanor convictions as an adult. *See* Tenn. Code Ann. § 40-35-114(1). The defendant also had three juvenile adjudications that would be felonies if committed by an adult. *See* Tenn. Code Ann. § 40-35-114(20). Furthermore, although the trial court rejected this enhancement factor as an element of the offense, we apply factor (9) since the defendant employed a firearm in the commission of these offenses. *See* Tenn. Code Ann. § 40-35-114(9). Use of a firearm is not an element of attempted first degree murder and may be used as an enhancement factor. *See* State v. Bradfield, 973 S.W.2d 937, 949 (Tenn. Crim. App. 1997). The trial court also applied enhancement factor (3), an offense involving more than one victim, and enhancement factor (10), committing a crime when the risk to human life was high. *See* Tenn. Code Ann. § 40-35-114(3) and (10). In its written order, the trial court rejected all mitigating factors.

Regardless of whether the trial court erred by applying enhancement factor (3), offense involving more than one victim, and enhancement factor (10), high risk to human life, *see* Tenn. Code Ann. § 40-35-114(3) and (10), our *de novo* review leads us to the conclusion that the presumptive sentence of twenty years is certainly not excessive. The clear application of three enhancement factors and the absence of any mitigating factors justify the sentences.

## C.  Consecutive Sentencing

Defendant claims the state failed to provide adequate notice of an intent to seek consecutive sentences, and the trial court inappropriately found his sentences for attempted first degree murder should be served consecutively to his life sentence for first degree murder. We disagree.

The trial court in its written order found the defendant had an extensive record of criminal activity. *See* Tenn. Code Ann. § 40-35-115(b)(2). The trial court at the trial implicitly, although not

expressly, noted that the defendant had little regard for human life and did not hesitate to commit a crime in which the risk to human life was high. *See* Tenn. Code Ann. § 40-35-115(b)(4).

## (1) Notice

Defendant relies on Tenn. Code Ann. § 40-35-202(a) and contends that by failing to give notice that it intended to seek consecutive sentencing until the day of the sentencing hearing, the state waived the right to seek consecutive sentences. However, Tenn. Code Ann. § 40-35-202(a) does not govern consecutive sentencing. State v. Robert Chapman, C.C.A. No. 02C01-9510-CR-00304, 1997 WL 11280, at *4 (Tenn. Crim. App. filed January 14, 1997, at Jackson), *perm. to app. denied* (Tenn. 1997). Rather, this statute only requires the state to provide notice of its intent to seek enhanced punishment of a defendant as a multiple, persistent, or career offender. *Id*. Thus, the state is not required to give notice that it is seeking consecutive sentencing.

## (2) Sentencing Guidelines

A court may order sentences to run consecutively if the court finds by a preponderance of the evidence that "[t]he defendant is an offender whose record of criminal activity is extensive; [or] [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(2) and (4); *see also* State v. Black, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Furthermore, in the event the trial court finds defendant is a "dangerous offender," it must also determine whether the consecutive sentences (1) are reasonably related to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). Contrary to defendant's argument, the use of an enhancement factor to increase the length of a sentence within the proper range does not bar the use of the same facts in imposing consecutive sentences. State v. Melvin, 913 S.W.2d 195, 205 (Tenn. Crim. App. 1995).

The defendant had an extensive record of criminal activity. Tenn. Code Ann. § 40-35-115(b)(2). His juvenile record as well as his adult record may be considered. *See* State v. Donielle L. House, C.C.A. No. M1998-00403-CCA-R3-CD, 1999 WL ___ (Tenn. Crim. App. filed December 15, 1999, at Nashville), *perm. to app. denied* (Tenn. 2000). The extensive prior record alone justifies consecutive sentencing. In addition, we find defendant's behavior indicated little or no regard for human life, and defendant did not hesitate in committing a crime in which the risk to human life was high. *See* Tenn. Code Ann. § 40-35-115(b)(4). Although the trial court did not address the Wilkerson factors, we conclude there is ample evidence to support the Wilkerson requirements. Initially, we find that consecutive sentencing is reasonably related to the seriousness of the offenses committed. Defendant shot and killed Paul Jefferies and attempted to kill two young girls, ages twelve and fourteen. In addition, there were several people present inside and outside the store who were also placed in danger when defendant randomly opened fire. We further conclude consecutive sentencing is necessary to protect the public from further criminal conduct by the defendant.

The trial court properly concluded that consecutive sentencing was warranted. Thus, this issue is without merit.

## **CONCLUSION**

Upon our review of the record, we conclude the trial court properly admitted the testimony of Shalina Williams and Latoya Jones regarding their identification of the defendant; the evidence was sufficient to sustain the defendant's convictions; and the trial court properly sentenced the defendant. Therefore, the judgment of the trial court is affirmed.

_____

JOE G. RILEY, JUDGE